## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Richard D. S.,

        Plaintiff,

v.

Andrew Saul,
Commissioner of Social Security,[1]

        Defendant.

Case No. 19-cv-0088 (TNL)

**ORDER**

---

Gerald S. Weinrich, Weinrich Law Office, Northgate Center, 1201 1/2 Seventh Street Northwest, Suite 214, Rochester, MN 55901 (for Plaintiff); and

Kizuwanda Curtis, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 340, Mailroom 104, Dallas, TX 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Richard D. S. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. *Andrew Saul*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner html (last visited Mar. 20, 2020). The Court has substituted Commissioner Saul for Nancy A. Berryhill. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 11, 13. For the reasons set forth below, Plaintiff's motion is denied and the Commissioner's motion is granted.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in 2015, asserting that he has been disabled since December 2010 due to a back injury, arthritis, degenerative disk disease, and "lumbar sponylosis [sic]" as well as inabilities "to sit or stand for longer than 30 minutes," lift more than 25 pounds, and "perform repetitive bending or kneeling motions." Tr. 59; *see also* Tr. 10, 71-72. Plaintiff also experienced "[s]ever[e] flares" with changes in the weather. Tr. 59; *accord* Tr. 71. Plaintiff's application was denied initially and again upon reconsideration. Tr. 10, 58, 69-70, 79. Plaintiff appealed the reconsideration of the DIB determination by requesting a hearing before an ALJ. Tr. 10, 87.

The ALJ held a hearing on April 25, 2018. Tr. 10, 28, 30. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review. Tr. 1-5, 183. Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 11, 13. This matter is now fully briefed and ready for a determination on the papers.

## III. ANALYIS

### A. Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he

threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual

unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

**B. Nature of DIB**

In order to be entitled to DIB, Plaintiff must establish that he was disabled before his insurance expired. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). "[T]he date of last insurance is the last date an individual is eligible to receive DIB in view of [his] earnings record. Thus, the claimant must establish disability on or before that date in order to be entitled to DIB." *Michelle P. v. Berryhill*, No. 17-cv-4286 (HB), 2019 WL 1318352, at *1 n.4 (D. Minn. Mar. 22, 2019), *aff'd sub nom.*, *Palmer v. Saul*, No. 19-2032, ___ F. App'x ____, 2020 WL 1289101 (8th Cir. Mar. 18, 2020) (per curiam). Plaintiff was last insured on September 30, 2015. *See, e.g.*, Tr. 12; Pl.'s Mem. in Supp. at 11, ECF No. 12; Comm'r's Mem. in Supp. at 2, ECF No. 14. Thus, Plaintiff must prove that he was disabled before September 30, 2015.

4

## C. Residual Functional Capacity

Plaintiff challenges the ALJ's assessment of his residual functional capacity at step four. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("The fourth step in this analysis requires the ALJ to determine a claimant's [residual functional capacity]." (quotation omitted)).

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c). And, "[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016).

### 1. Medical Evidence

Plaintiff has a history of chronic back pain stemming from a motor vehicle accident in 1999 and work injury a few years later "while lifting a heavy load." Tr. 360; *see* Tr. 358, 355, 339. Plaintiff "has been dealing with some degree of chronic back pain and frequent exacerbations since that time." Tr. 360.

### a. 2010 through 2015

In June 2010, Plaintiff reported "fairly frequent flares, exacerbated by long car rides, lifting anything over 50 ponds, and sudden movements." Tr. 360. Plaintiff described his "pain as a dull ache with occasional shooting pains down both legs." Tr. 360; *see* Tr. 358. Plaintiff "ha[d] missed a couple of family functions due to pain." Tr. 360. Plaintiff rated his pain at 3, and stated it was worse "after sitting for a long time." Tr. 360; *see* Tr. 358, 355. While Plaintiff showed "[m]inimal spasm of the paraspinal musculature," the examination of his spine was largely normal, including full range of motion and no tenderness. Tr. 361; *see* Tr. 359. Plaintiff was diagnosed with chronic mechanical lumbosacral back pain, and physical therapy was recommended for core stabilization. Tr. 361, 359; *see* Tr. 355-57. When he concluded physical therapy at the end of July, Plaintiff reported improvement in his back pain, including being "able to tolerate driving for nearly twice as long compared to previously." Tr. 354. He had full range of motion on extension and "[g]ood abdominal bracing contraction." Tr. 354.

Plaintiff was seen in physical medicine and rehabilitation again approximately five months later for an "acute episode of low back pain after lifting his dog," who weighed about 70 pounds. Tr. 352; *see, e.g.*, Tr. 342, 339, 329, 455, 445, 432. Other than this

episode, Plaintiff reported that "he was doing very well." Tr. 352; *accord* Tr. 455. Plaintiff had "[r]educed lumbar extension" and "[f]ocal motion dysfunction of the left SI joint." Tr. 352; *accord* Tr. 455.

Plaintiff next sought treatment for low back pain in early July 2011. Tr. 342, 445. Plaintiff similarly reported an increase in pain with overexertion "and prolonged periods of sitting." Tr. 342; *accord* Tr. 445. Plaintiff had some pain with palpation of his lumbar spine but continued to have good range of motion. Tr. 343, 446. He had some increased pain "with extension and lateral flexion combined." Tr. 343; *accord* Tr. 446. X-rays of Plaintiff's lumbar spine showed "[l]oss of lumbar lordosis" and "[s]ubtle hypertrophic changes . . . ." Tr. 364.

At the end of August, Plaintiff consulted with the spine center. Tr. 339, 442. Plaintiff described his pain "as a deep ache" that was "constant . . . , dull and achy, [and] primarily in the back." Tr. 339; *accord* Tr. 442. Plaintiff's pain worsened with prolonged sitting; "[s]tatic positioning such as standing . . . bother[ed] him"; and his "walking tolerance [wa]s reduced to 20 to 30 minutes." Tr. 339; *accord* Tr. 442. Upon examination, Plaintiff had "reasonable preservation of range of motion, though he [wa]s cautious and guarded with initial movements." Tr. 340; *accord* Tr. 443. Plaintiff had "no significant change in pain . . . with forward flexion," but did have some increased pain with attempts to extend." Tr. 340; *accord* Tr. 443. It was recommended that Plaintiff undergo a "work capacity evaluation and work hardening program." Tr. 340; *accord* Tr. 443. Plaintiff was also referred to orthopedic surgery for a consultation regarding facet joint injections. Tr.

340, 443; *see* Tr. 339.  In addition, Plaintiff was encouraged to increase his physical activity.  Tr. 340, 443.

A subsequent MRI showed "age-appropriate related changes throughout the spine with the exception of the 5-1 motion segment," where Plaintiff had "arthritic facet changes as well as disk joint changes with a disk herniation at that level."  Tr. 337; *see* Tr. 364.  Orthopedic surgery recommended that Plaintiff undergo "a facet injection at the 5-1 level."  Tr. 337; *accord* Tr. 440.  Plaintiff ultimately decided not to have the injection.  *See* Tr. 333, 324, 436.

In March 2012, Plaintiff again presented with complaints of low back pain.  Tr. 333, 436.  Plaintiff attempted to treat his pain with stretching exercises and "occasional over-the-counter medications."  Tr. 333; *accord* Tr. 436.  Plaintiff "[wa]s unable to find consistent work" because "he [wa]s unable to work for more than an hour without significant back pain."  Tr. 333; *accord* Tr. 436.  Plaintiff also reported that "he [wa]s spending two to three days barely able to get out of bed after 30 to 45 minutes of exercise."  Tr. 333; *accord* Tr. 436.

Plaintiff was referred back to physical medicine and rehabilitation to be fitted with a TENS unit.  Tr. 334, 437.  Massage and acupuncture were also suggested.  Tr. 334, 437; *see* Tr. 328-30, 431.  Additionally, Plaintiff was given the following work restrictions:

> These restrictions should include no lifting over 10 to 25 pounds.  He should avoid bending and twisting.  He should avoid heavy pushing or pulling.  He should avoid prolonged standing.  If a desk job is obtained, he would stand up every 20 minutes to a half an hour to stretch and no matter what the type of job, he will likely need frequent breaks at least every hour in order to rest his back and to stretch.

8

Tr. 334; *accord* Tr. 437.

At the time he was fitted with the TENS unit, Plaintiff rated his pain at 6 "with sitting and bending most painful." Tr. 331; *accord* Tr. 434. Plaintiff reported that he had "increased his exercise recently including walking 30-45 minutes most days of the week and swimming a couple of days per week." Tr. 331; *accord* Tr. 434. Upon examination, Plaintiff's "[l]umbar range of motion [wa]s slightly limited into extension." Tr. 331; *accord* Tr. 434. While "[e]xtension exercises centralize[d] his pain," it was also noted that Plaintiff "demonstrate[d] much better than average core strength." Tr. 331; *accord* Tr. 434. A trial of the TENS unit resulted in no "pain upon getting up," and Plaintiff stated that he had "no[t] fe[lt] this good for a couple of years." Tr. 331; *accord* Tr. 434. Roughly two months later, Plaintiff reported that the TENS unit was "very helpful" at "keeping his pain under control." Tr. 329; *accord* Tr. 432.

Plaintiff was next seen for complaints of back pain in December. Tr. 324, 427. Plaintiff reported that "prolonged sitting and standing (for about an hour)" caused pain in his low back. Tr. 324; *accord* Tr. 427. Plaintiff's "[s]pine flexion [wa]s maximum at 90 degrees" and "[e]xtension [wa]s maximum at 20 degrees." Tr. 324; *accord* Tr. 427. Plaintiff's examination was otherwise unremarkable. Plaintiff was given a prescription for tramadol[2] and referred for "work rehabilitation/physical therapy" and another consultation with the spine center. Tr. 325; *accord* Tr. 427-28.

---

[2] "Tramadol is used to relieve moderate to moderately severe pain." *Tramadol*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a695011.html (last visited Mar. 20, 2020).

When he met with the work rehabilitation center in mid-January 2013, Plaintiff reported that he has been unable to work "because of persistent low back pain with any for [sic] of activity or prolonged sedentary postures." Tr. 321; *accord* Tr. 424. Things that aggravated Plaintiff's pain included sitting, walking, standing, and lifting. Tr. 321, 424. Among other things, Plaintiff's pain was improved with walking, the TENS unit, and changing positions frequently. Tr. 321, 424. Upon examination, Plaintiff's range of motion was generally normal, although Plaintiff "showed juddering of the low back, indicating weakness." Tr. 322; *accord* Tr. 425. His lumbar spine was tender to palpation and the active straight leg test was "positive—indicating trunk motor control inhibition." Tr. 322; *accord* Tr. 425. With respect to his core strength, Plaintiff was "unable to contract transversus abdominis effectively" and "unable to activate lumbar multifidi." Tr. 322; *accord* Tr. 425.

Plaintiff attended physical therapy twice per week for one month. *See* Tr. 293-319, 395-423. Plaintiff generally reported that he was feeling much better, rating his pain between 0 and 1. *See, e.g.*, Tr. 319, 315, 313, 311, 309, 307, 305, 303, 301, 422, 418, 416, 414, 412, 410, 408, 406, 404, 395. During this time, Plaintiff experienced some increased pain after volunteer work, Tr. 317, 420, and had an episode of low back pain that spiked up to 8 but diminished within in a few days, *see* Tr. 299, 297, 402, 400. Plaintiff increased the amount of weight he was able to lift, carry, and push/pull from 25 to 45 pounds. Tr. 315, 313, 311, 309, 307, 305, 303, 301, 297, 295, 293, 418, 416, 414, 412, 410, 408, 406, 404, 400, 398, 395. At the end of February, Plaintiff reported that he was interviewing for

a job "retrieving and depositing money to ATM's around the city" and was "committed to doing a regular workout routine" with his wife.  Tr. 293; *accord* Tr. 395.

Plaintiff was seen in December 2014 for low back pain, reporting that "he ha[d] developed a new pain that [wa]s a bit lower than the chronic pain he usually has."  Tr. 276; *accord* Tr. 379.  Two prescriptions were suggested to Plaintiff, but he was unsure whether he wanted to try either of them.  Tr. 277; *accord* Tr. 380.  It was also recommended that Plaintiff make frequent stops during an upcoming trip to Iowa so that he could get out and walk around.  Tr. 277, 380.

### b.  After 2015

Towards the end of July 2016, Plaintiff followed up to see whether he was "eligible for medical marijuana to treat his chronic pain."  Tr. 470.  Plaintiff reported that his "[p]ain [wa]s 3/10 at its lowest" and most consistently, but "may go up higher on other days and . . . typically gets worse as the day goes on."  Tr. 470.  Plaintiff reported that he had tried a number of pain medications over the years, including narcotic medications.  Tr. 470.  None of them "provided any significant benefit and many of them . . . caused side effects."  Tr. 470.  The narcotic medications left Plaintiff "feel[ing] foggy."  Tr. 470.  Plaintiff reported that his back pain was often "aggravated by simple tasks such as bending over and tying his shoes or picking something up off the floor.  At those times, the pain c[ould] become excruciating and incapacitating, and [Plaintiff's] wife w[ould] often need to stay home from her job so she can take care of their son."  Tr. 470.

Plaintiff's examination was generally unremarkable, although the "[s]traight leg raise [did] cause[] some increase in posterior buttock and thigh pain at approximately 45

degrees bilaterally." Tr. 471. While the treatment provider did "not think it [wa]s unreasonable to consider medical marijuana," he preferred that Plaintiff "be seen by a pain specialist" for additional treatment options and the "appropriateness . . . [of] medical marijuana." Tr. 471.

Plaintiff had a consultation with the pain clinic at the beginning of August. Tr. 466. The consulting provider noted that Plaintiff had not previously tried "any neuropathic medications including Cymbalta, gabapentin or Lyrica." Tr. 468. Plaintiff was "not interested in trialing injections or other medications due to potential side effects." Tr. 468. Plaintiff was subsequently certified for medical marijuana. Tr. 464.

When Plaintiff was next seen for a follow-up in January 2017, Plaintiff was "quite pleased with the results" of medical marijuana and found that "it significantly reduce[d] his pain much more so than other medications" without "any significant side effects." Tr. 461. Plaintiff reported that "prolonged sitting or standing will cause his back to flare," requiring him to lie down. Tr. 461. Plaintiff rated his pain at 0. Tr. 462. Plaintiff inquired about disability and was referred to occupational medicine. Tr. 462.

Plaintiff's next follow-up was near the end of March. Tr. 459. Plaintiff continued to experience relief with medical marijuana. Tr. 459. Plaintiff did not use it on a daily basis, but just for flare-ups. Tr. 459. It was noted that Plaintiff

> takes two puffs, and he may do that as often as every four hours; however, he is typically just doing it on one dose a day, and then he may not use it again for a couple of weeks. He finds that it does significantly reduce his pain, it causes mild side effects of leaving him feeling somewhat fuzzy mentally, and also leaves his arms and legs feeling heavy.

Tr. 459. Plaintiff rated his pain at 2. Tr. 460.

In early August, Plaintiff consulted with Clayton T. Cowl, M.D., regarding his request for completion of disability forms. Tr. 481, 499. Based on the consultation and a review of Plaintiff's medical records, Dr. Cowl noted that Plaintiff "likely could do some form of sedentary exertions without significant lifting but that he would have to have the ability to change positions frequently (e.g. no prolonged sitting)." Tr. 483; *accord* Tr. 501. Dr. Cowl also noted that Plaintiff "may need to meet with a vocational counselor to identify potential positions for which he may be eligible" and planned to see Plaintiff again once he had completed a functional capacity evaluation. Tr. 483; *accord* Tr. 501.

The functional capacity evaluation took place in September. Tr. 484-89, 502-07. In relevant part, the occupational therapist summarized that Plaintiff had the ability to push and pull 30 pounds rarely and 0 pounds occasionally or frequently; lift up to 25 pounds rarely and 0 pounds occasionally or frequently; lift overhead 25 pounds rarely, 10 pounds occasionally, and 0 pounds frequently; and carry up to 40 pounds rarely and 0 pounds occasionally or frequently. Tr. 489, 507; *see* Tr. 491, 509.

### 2. Opinion Evidence

#### a. Dr. Cowl

Dr. Cowl completed a "Disorders of the Spine Treating Physician Data Sheet" following the residual-functional-capacity evaluation. Tr. 475-80, 493-98. Dr. Cowl described Plaintiff's impairments as "[s]mall broad-based central disc protrusion of the lumbosacral interspace between L5 and S1" and "[c]hronic paraspinal myofascial pain." Tr. 476; *accord* Tr. 494. Dr. Cowl checked "yes" when asked if treatment had significantly

improved Plaintiff's pain and noted Plaintiff's use of ibuprofen and medical marijuana. Tr. 476, 494.

Dr. Cowl opined that Plaintiff needed to change positions every hour. Tr. 477-78, 495-96. Plaintiff could occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than that. Tr. 479, 497. Plaintiff could occasionally bend/stoop while carrying weight. Tr. 480, 498. When asked whether Plaintiff had the ability to stand and/or walk for 6 hours in an 8-hour day, Dr. Cowl checked "unknown," and wrote: "[Plaintiff] could likely stand and/or walk for extended periods of time without weight handling maneuvers. Repetitive lifting or push/pulling would need to be avoided." Tr. 479; *accord* Tr. 497.

### b. State Agency Medical Consultants

As relevant here, the state agency medical consultants opined both initially and on reconsideration that Plaintiff could frequently lift and/or carry 10 pounds and occasionally lift and/or carry 20 pounds. Tr. 65, 75. Plaintiff was otherwise unlimited in his ability to push and/or pull. Tr. 65, 76. Plaintiff could sit as well as stand and/or walk for 6 hours in an 8-hour day. Tr. 65, 76. Plaintiff had no manipulative limitations. Tr. 66, 76. The state agency medical consultants explained that this light residual functional capacity was based on "the imaging results, exam findings, and [Plaintiff's] pain." Tr. 66; *accord* Tr. 77.

### 3. ALJ's Decision

Finding that Plaintiff had the severe impairments of "degenerative disc disease of the lumbar spine" and "chronic myofascial pain," the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work with certain postural and environmental limitations. Tr. 13. Plaintiff was further limited by "need[ing] a sit stand

option permitting change in position every 20-30 minutes if needed and without disturbing the workplace." Tr. 13.

### 4. Treatment of Dr. Cowl's Opinion

In determining Plaintiff's residual functional capacity, the ALJ placed "moderate weight" on Dr. Cowl's opinion. Tr. 16. When describing the weight given to Dr. Cowl, the ALJ noted that "[p]arts of [his] opinion were not couched in vocational terms" and "Dr. Cowl wanted [Plaintiff] to meet with a vocational counselor to identify potential positions for which he may be eligible and therefore[] greater weight was not given." Tr. 16.

Plaintiff argues that the ALJ's residual-functional-capacity determination is inconsistent with Dr. Cowl's opinion and the ALJ erred by not giving greater weight to Dr. Cowl. These arguments are somewhat intertwined.

### a. Weighing Opinions of Treating Physicians

"A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). "Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). When a treating source's opinion is not given controlling weight, the opinion is weighed based on a number of factors,

including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *Cline*, 771 F.3d at 1103.

### b. Weight Assigned to Dr. Cowl's Opinion

The ALJ limited Plaintiff to sedentary work.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

The ALJ's conclusion that Plaintiff is capable of sedentary work is entirely consistent with Dr. Cowl's opinion that Plaintiff was capable of lifting and/or carrying 10 pounds occasionally and less than that on a frequent basis. It is also largely consistent with Dr. Cowl's opinion that there be no "weight[-]handling maneuvers" while Plaintiff was standing or walking. Sedentary work involves "occasionally" lifting or carrying small items. *See* 20 C.F.R. § 404.1567(a). "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." *Titles II and XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, SSR 96-

16

9p, 1996 WL 374185, at *3 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-9p]. Thus, sedentary work would not require Plaintiff to lift and/or carry these small items for a majority of the workday. And, in any event, the occasional carrying or lifting of such items falls well within Dr. Cowl's opinion that Plaintiff could *frequently* lift or carry less than 10 pounds.

Moreover, when limiting Plaintiff to sedentary work, the ALJ gave greater weight to Dr. Cowl as a treating source over the state agency medical consultants who opined that Plaintiff was capable of light work, explaining that additional evidence (including "treating source records") and testimony at the hearing "demonstrate[d] that [Plaintiff] was more limited than originally thought by the reviewing state experts" and "the reviewing experts did not have the opportunity to examine [Plaintiff]." Tr. 16. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

The ALJ additionally required that Plaintiff have a sit-stand option that allowed him to change positions approximately every half hour. This requirement is likewise consistent with Dr. Cowl's opinion that Plaintiff needed to be able to change positions. Notably, not only was this requirement consistent with Dr. Cowl's opinion, the ALJ's residual-functional-capacity determination was *more* limited that Dr. Cowl's opinion as it allowed Plaintiff to switch positions with even greater frequency than Dr. Cowl.

The thrust of Plaintiff's argument is that the ALJ erred by not including a limitation on repetitive lifting and pushing/pulling. Plaintiff asserts that "[t]he limitation in the ability

to use one's hands and arms for pushing and pulling argue[s] strongly against the ability to perform sedentary work." Pl.'s Mem. in Supp. at 16. Plaintiff asserts that "[t]he ALJ did not make any finding to show that Dr. Cowl's opinions were contradicted by the record, or point to any other part of the record that supported a lesser degree of functional limitation." Pl.'s Mem. in Supp. at 18. Plaintiff further asserts that it makes sense Dr. Cowl's opinion may not have been "couched in 'vocational terms'" because he "is not a vocational counselor, but a medical doctor." Pl.'s Mem. in Supp. at 18.

First, while Plaintiff asserts that a limitation on pushing or pulling would significantly impact the ability to perform sedentary work, that is not the case. As the Commissioner points out, "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base." SSR 96-9p, 1996 WL 374185, at *6. Rather, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers[,] i.e., bilateral manual dexterity[,] . . . for repetitive hand-finger actions." *Id.* at *8. While Dr. Cowl opined that Plaintiff should not push or pull repetitively, he did not opine that Plaintiff had limitations regarding the use of his hands and fingers. Plaintiff has not established that he has any limitations regarding his ability to handle and work with small objects, let alone *significant* limitations. *See id.* ("Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base."). Second, contrary to Plaintiff's assertion that the ALJ did not reference other evidence in the record supporting a lesser degree of limitation, the ALJ specifically discussed the results of the

functional capacity evaluation, including the finding that Plaintiff could push and/or pull 30 pounds.

The Commissioner acknowledges, and the Court agrees, that "the ALJ could have been more articulate in describing the exact limitations from Dr. Cowl's opinion" that were rejected or accepted. Comm'r's Mem. in Supp. at 9. But, any arguable deficiency in the ALJ's opinion-writing technique had no practical effect on this case. *See, e.g.*, *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) ("[A]n arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." (quotation omitted)). While the ALJ did not give controlling weight to Dr. Cowl, the ALJ's analysis overall makes clear that Dr. Cowl's opinion was not disregarded and properly considered within the context of the entire record. By limiting Plaintiff to sedentary work with a sit-stand option, the ALJ recognized and incorporated the serious functional limitations present in Dr. Cowl's opinion into Plaintiff's residual functional capacity, crediting his opinion over the less restrictive opinions of the state agency medical consultants. *See* SSR 96-9p, 1996 WL 374185, at *3 ("Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations."). Plaintiff has not shown what effect, if any, the absence of a push/pull limitation had on the outcome of his case.

Based on the foregoing, the Court concludes that there is substantial evidence in the record as whole to support the weight given to Dr. Cowl's opinion.

### 5. Side Effects of Medical Marijuana

At the hearing, Plaintiff testified that he uses medical marijuana on a daily basis. Tr. 46. Plaintiff testified that it "makes [him] feel fuzzy" and "makes [his] extremities feel very heavy." Tr. 46. Plaintiff described the feeling as being "pinned in the chair, like [he has] a weight on [him]." Tr. 46. Plaintiff also testified that while he can hold a normal conversation, at times he is "not coherent." Tr. 46. Plaintiff testified that these side effects last for approximately four hours. Tr. 46. Plaintiff argues that the ALJ failed to take into account such side effects when determining his residual functional capacity.

As stated above, Plaintiff must establish that he was disabled as of his date last insured to qualify for DIB. Plaintiff was not prescribed medical marijuana until almost a year after his date last insured. Because Plaintiff did not begin using medical marijuana until after the date he was last insured, the side effects he experiences are not relevant to whether he was disabled during the time period he was eligible for DIB. *See Cox*, 471 F.3d at 907 ("Evidence from outside the insured period can be used in helping to elucidate a medical condition *during* the time for which benefits might be rewarded." (emphasis added)). Moreover, as the ALJ correctly pointed out, Plaintiff did not report "any significant side effects" during follow-up appointments. Tr. 15. Considering that Plaintiff was not using medical marijuana during the relevant period and reported mild side effects at most, Plaintiff has not shown that his use of medical marijuana caused greater functional limitations than determined by the ALJ.

## IV. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons

stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement, ECF No. 11, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 13, is
   **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March____30____, 2020                           _____*s/ Tony N. Leung*_____
                                                Tony N. Leung
                                                  United States Magistrate Judge
                                                  District of Minnesota

                                                  *Richard D. S. v. Saul*
                                                  Case No. 19-cv-0088 (TNL)